McBRIDE, Judge.
Plaintiff, an electrical contractor, sues defendant Buceóla for $2,620.00 due on a contract whereunder plaintiff agreed to and did perform certain electrical work on four double houses owned by said defendant. Plaintiff seeks to cast the other defendant, Joseph S. Montaldo, as a debtor in solido for said amount, it being alleged in the original petition that Montaldo, “told petitioner that he would pay the Two Thousand Six Hundred Twenty and No/100 ($2620.00) Dollars due petitioner for the said Pleasure and London Avenue electrical work if Mr. Buceóla did not pay same, and if petitioner would proceed to complete those houses with this understanding.” In plaintiff’s amended and supplemental petition, it is alleged that Montaldo, “told petitioner that he would pay the Two Thousand Six Hundred Twenty and No/100 ($2620.00) Dollars due to petitioner for the said Pleasure and London Avenue electrical work; that petitioner had nothing to worry about, that if petitioner would complete the work, ‘we’— the defendants — can borrow One Hundred Thousand and No/100 ($100,000.00) Dollars, and then there will be more than enough for ‘us’ * *
In answer Montaldo denied having agreed to pay for the work. Montaldo specifically denied he had any interest of any kind in the houses upon which the work was done.
After a trial below, judgment was rendered in favor of plaintiff and against Buc-eóla and Montaldo, in'solido, for $1,310.00; further judgment was also rendered against Buceóla alone for $1,310.00. Montaldo appealed.
In January, 1960, there were two contracts existing between plaintiff and Buc-eóla, the owner-builder. Under one of these plaintiff had contracted with Buceóla to perform electrical work on a house situated in Wellington Drive. The Wellington Drive job had been completed by plaintiff, but there was due and unpaid by Buceóla on that contract $672.92. The other contract concerned electrical work to be performed on the premises 1769-71, 1773-75, 1777-79 Pleasure Street and 3416-18 London Avenue. One-half the work under the latter contract had been performed by plaintiff and all electrical wiring had been “roughed-in.” About this time Buceóla was then experiencing financial difficulties and could not pay plaintiff, who not only demanded payment of the $672.92 owed on the Wellington Drive house but also payment for such work as had been done under the other contract. Plaintiff threatened to quit unless such payment was forthcoming. The evidence shows that Buceóla asked plaintiff to accompany him to defendant Montaldo’s office. Montaldo is engaged in the general insurance business. According to Buceóla and Montaldo, the purpose of the visit-to the latter’s office was to have Montaldo verify the fact to plaintiff that Buceóla had applied for a loan on the properties. Plain *548 tiff’s testimony is that he did not know exactly why he was taken to Montaldo’s office, hut his impression was he would get some money on his visit there.
Some discussion took place between plaintiff, Buceóla and Montaldo, but the testimony is so confused we are unable to determine with any degree of certainty what was said at the meeting between the three parties. Plaintiff’s testimony is in itself conflicting. Pie stated:
“When he (Montaldo) gave me a check for a piece of property * * * I didn’t even know the man existed * * * Mr. Montaldo he gave me a check for Wellington Drive, which I wired for Mr. Buceóla * * * he paid me that check for Wellington Drive, and then when he gave me a check for $25.00 more pertaining to fixtures on the four properties that anticipate on finishing, and then he tells me right then and there he says, ‘You go finish these properties this week. We only owe so much money on the property, and we can borrow 25,000 just that quick.
“ ‘And I think we owe approximately 40,000. You come here by next Friday and you will have your money. I will see that you get your money.’ ” Word in bracket ours.)
íjí sjt V
“ * * * ‘Don’t worry about your money. Didn’t I pay you for Wellington Drive? I will pay you for these other properties.’ ”
******
“So now I am under the impression I am not working for Mr. Buceóla any more at all. I am working for this man, and I had more faith in this man.”
* * * * * *
«* * * an¿ jle said; ‘We haven’t secured the loans’ * * * or something *• * * ‘yet for the properties, but don’t worry about it.’ ”
í¡í í¡í 5¡í
“I finished the three houses on Pleasure and the one on London because I was under the impression that now I am working for Mr. Montaldo after the man gave me a check and told me he would pay me and there was no question about it.”
* * * ‡ * *
“He said, ‘I will pay you.’ ”
Buceóla states what Montaldo told plaintiff was, “that there was a loan to be made-on the houses that he should get them finished because without them being completed well nobody could get any money.” At another point in his testimony Buceóla stated that Montaldo told plaintiff, “that he would get paid for this job,” and again, “Mr. Montaldo said he would be paid * *• that there was money coming on the jobs and it would be paid.”
Montaldo’s version of the discussion is r
“Mr. Buceóla owed Mr. Tribou some money, and I think all he wanted me to be present for was to verify that he was applying for a loan, and that is about the extent of that conversation.”
Porche, who was a partner of plaintiff at the time of the meeting in Montaldo’s office, testified as plaintiff’s witness, but his testimony is at variance with that of plaintiff. Porche stated that after the conference at Montaldo’s office plaintiff told him Montaldo had, “guaranteed him that he would be paid for the work,” and that Montaldo also had' said, “that he would see to it that we were paid for these houses on Pleasure Street which are in question, and after discussion between Mr. Tribou and myself we decided to go ahead and do this work.”
At the meeting between plaintiff, Buceóla and Montaldo, the latter did write out and signed two checks to plaintiff. From the record, we cannot tell whether the checks-were drawn on Montaldo’s personal banking account or whether they were checks issued by Montaldo as the representative of a corporation. But be that as it may, one of *549 the checks spoken of by plaintiff in his above quoted testimony was for $672.92, which represented the balance owed plaintiff by Buceóla on the Wellington Drive property. The second check was for $25.00 and given to plaintiff to purchase electrical fixtures for the Pleasure Street and London Avenue properties.
Montaldo explained his giving the larger check by saying that the Wellington Drive contract had* been bonded (presumably by one of the insurance companies he represented), and he had obligated himself to indemnify the company against any losses and for that reason he paid the balance due plaintiff on said contract.
That there was some discussion at the meeting regarding a loan which had been applied for by Buceóla there is no doubt. Neil Christopher, president of the Fidelity Bonding and Mortgaging Company, testified that in 1960 Buceóla “arranged” for a loan on the Pleasure Street and London Avenue properties, but the record does not show whether the application for the loan had been made prior to or after the meeting took place. We say there is no doubt there was a discussion regarding a loan because we find, according to plaintiff’s testimony, that subsequent to the meeting he talked to Montaldo either via telephone or at his office regarding payment for the job and that Montaldo told him, “We haven’t secured the loans * * * or something * * * yet for the properties, but don’t worry about it.”
Nowhere in the record does it clearly appear what Montaldo’s motive was in writing the check for $25.00 for the purchase of electrical fixtures. But it can be gleaned from the record that this was intended to be an advance to Buceóla in anticipation of a loan being made to him. This thought is emphasized by the fact that Montaldo neither had any financial interest in the Pleasure Street or London Avenue houses nor had the job been bonded by any company he represented.
Plaintiff takes the position that Montaldo personally obligated himself to pay for the unfinished work on the Pleasure Street and London Avenue properties, but we fail to find anywhere in the record a showing that Montaldo personally agreed to pay or to be responsible. The only construction we can place on the testimony as a whole, coupled with plaintiff’s allegations in his two petitions, is that Montaldo would see to it plaintiff was to be paid out of the proceeds of a loan negotiated or to be negotiated by Buceóla.
But be that as it may, the trial court erroneously rendered judgment against Montaldo for $1,310.00. The judge reasoned that this was the amount of work which remained to be done under the contract and that Montaldo induced plaintiff to complete such work by agreeing to' become personally liable and responsible to plaintiff. The court in his written reasons for judgment said:
“The Court is convinced that Mr. Montaldo agreed to pay the plaintiff to complete the electrical work on the Pleasure Street and London Ave. properties.
“The job was half finished at the time of the agreement. Therefore the amount due by Mr. Montaldo to the plaintiff is one half of $2620.00, or $1310.00. The remaining half of the money due plaintiff falls in the category of an agreement to pay the debt of a third person.”
This suit is for a sum much in excess of $500.00. LSA-C.C. art. 2277 provides:
“All agreements relative to movable property, and all contracts for the payment of money, where the value does not exceed five hundred dollars, which are not reduced to writing, may be proved by any other competent evidence; such contracts or agreements, above five hundred dollars in value, must be proved at least by one credible witness, and other corroborating circumstances.”
*550 The jurisprudence of the state is so well settled that no citation of authorities is required to the point that the testimony of one witness unsupported by corroborating circumstances is insufficient to prove a contract or a moneyed claim where the amount exceeds $500.00. Instead of corroborating plaintiff, the testimony of plaintiff’s former partner Porche effectually destroys the contention that Montaldo personally agreed to pay for the work or to assume primary responsibility therefor. Porche, throughout his testimony, stated that plaintiff had told him that Montaldo had “guaranteed to pay for the work” and “that he would see to it that we were paid for these houses * * Plaintiff reported to Porche, then his partner, what took place in Montaldo’s office, and Porche’s testimony certainly does not reflect that it was plaintiff’s then understanding that Montaldo had made an unqualified promise to personally pay for the completion of the unfinished portion of the job.
It is argued by plaintiff’s counsel that the issuance of Montaldo’s two checks to plaintiff has the effect of corroborating the contention of plaintiff that Montaldo had agreed to personally pay for plaintiff’s work. We do not agree. The words “corroborating circumstances” used in LSA-C.C. art. 2277 means only the surrounding or attending facts. We think Montaldo plausibly explained why he paid the balance due on the Wellington Drive property. He was satisfying, by making such payment, the indemnity agreement he had made with his company which had bonded the Wellington Drive job. The $25.00 check seems to have been nothing more than an advance to Buc-eóla against a future loan to be made by him. Merely because Montaldo made such advance to Buceóla so that electrical fixtures could be secured does not amount to a substantiation of plaintiff’s claim that Mon-taldo was to pay for the balance of the work to be done on the four pieces of property.
So, even if we construe plaintiff’s testimony to mean that there was an unqualified obligation assumed by Montaldo to pay for the remaining work on the four houses, there are no corroborating circumstances, and plaintiff has not proven his claim to that degree of certainty required by LSA-C.C. art. 2277.
For the reasons assigned, the judgment appealed from is reversed insofar as it runs against Montaldo and is amended so as to provide that plaintiff’s claims as against said defendant are dismissed at plaintiff’s costs, and as thus amended and in all other respects the judgment is affirmed; plaintiff is cast for the costs of appeal.
Reversed in part, amended and affirmed.